752 F.2d 903
 1985 A.M.C. 913, 35 USLW 2387
 EAST RIVER STEAMSHIP CORP., A New York Corporation;
Kingsway Tankers, Inc., A New York Corporation; Queensway
Tankers, Inc., A Delaware Corporation; Richmond Tankers,
Inc., a Delaware Corporation, Appellants,
v.
DELAVAL TURBINE, INC., now known as Transamerica Delaval
Inc., A Delaware Corporation, Appellees.
 No. 83-5192.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 18, 1983.
Reargued In Banc Nov. 13, 1984.
Decided Jan. 16, 1985.
As Amended Jan. 28, 1985.
Rehearing and Rehearing En Banc Denied Feb. 13, 1985.
 
 Clarkson S. Fisher, Jr. (argued), George J. Koelzer, Evans, Koelzer, Osborne, Kreizman & Bassler, Red Bank, N.J., Thomas E. Durkin, Jr., James T. Owens, Newark, N.J., for appellants.
 Robert E. Smith (argued), Norman L. Greene, Guggenheimer & Untermyer, New York City, Waldron Kraemer, Kasen, Kraemer, Burns & Lovell, Newark, N.J., for appellees.
 Argued November 18, 1983
 Before HIGGINBOTHAM and BECKER, Circuit Judges, and NEWCOMER,* District Judge.
 Reargued In Banc November 13, 1984
 Before ALDISERT, Chief Judge, and SEITZ, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM and BECKER, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge.
 
 
 1
 The issue on this appeal, considered by the court in banc, is whether, under admiralty law, damage to a product caused by a design defect is recoverable in tort. We hold that such damage is not recoverable in tort where the design defect does not pose an unreasonable risk of harm to persons or property other than the product itself, as measured by the nature of the design defect, the manner in which the defect manifests itself, and the nature of the inherent risk, if any, created by the design defect.
 
 I.
 
 2
 The plaintiffs-appellants ("the charterers") are bareboat charterers of four supertankers, who seek recovery for losses caused by allegedly defective turbines designed and manufactured by defendant-appellee Delaval Turbine, Inc. ("Delaval"), and installed on the supertankers. Component parts on the turbines of all four ships were replaced after problems in operation arose, causing loss to the charterers in the nature of costs of replacement and repair, and lost profits from "down-time." No personal injury or property damage, however, other than to the turbine parts, resulted from the malfunctions.
 
 
 3
 The four supertankers were constructed by Seatrain Shipbuilding Corporation ("Seatrain") in Brooklyn, New York, and were christened the STUYVESANT, the WILLIAMSBURGH, the BROOKLYN, and the BAY RIDGE. Seatrain contracted with Delaval to provide high pressure turbines to serve as the main propulsion units in these vessels, and to supervise the installation of the turbines.
 
 
 4
 The STUYVESANT was completed on or about July 1, 1977, and commenced service. In December 1977, near the port of Valdez, Alaska, the STUYVESANT's high pressure turbine malfunctioned. Superheated steam was leaking from the junction between the turbine's casing and the steam inlet control valve chest. Interim repairs were made at Valdez, but problems with the high pressure turbine recurred shortly after the STUYVESANT departed from the port. The charterers allege that these problems, which lowered turbine pressure and reduced the ship's speed, endangered the STUYVESANT during a storm that it encountered off the coast of Alaska. An unsworn document submitted by the charterers in opposition to summary judgment represents that because of the lack of power and "mountainous seas," estimated to be at least 65 feet high, the vessel drifted toward the lee shore of the Gulf of Alaska. The STUYVESANT eventually made headway, however, and continued on a seven-week journey to Panama. After leaving Panama and upon further traveling to San Francisco, an inspection of the STUYVESANT revealed damage to several parts of the turbine, including the first stage steam reversing ring. The damaged parts were replaced by parts taken from the BAY RIDGE, which was still under construction.
 
 
 5
 In April 1978, following another voyage, the first stage steam reversing ring of the STUYVESANT's high pressure turbine, which had been taken from the BAY RIDGE, was found to have deteriorated, and was replaced by another ring taken from the BROOKLYN. In August 1978, the ring was again replaced--this time by a newly-designed ring manufactured by Delaval, which presumably corrected the defect in the earlier ring.
 
 
 6
 The BROOKLYN was completed in December 1973, and the WILLIAMSBURGH was completed in December 1974. After the inspection of the STUYVESANT turned up problems with its turbine, both the BROOKLYN and WILLIAMSBURGH, which were already in service, were inspected. These inspections revealed damage similar to that found in the STUYVESANT's high pressure turbine. The damaged parts were repaired and reinforced by Delaval. Subsequently, in the summer of 1978, the first stage steam reversing rings of both ships were replaced by newly-designed rings identical to the one placed in the STUYVESANT. Between December 8, 1979, and January 24, 1980, additional repairs were made on the WILLIAMSBURGH's low pressure turbine. All of these repairs and replacements took place in port.
 
 
 7
 The BAY RIDGE was completed in early 1979. Although its high pressure turbine operated with one of Delaval's newly designed rings, its low pressure turbine suffered damage in March 1980, allegedly as a result of the improper installation of the vessel's astern guardian valve. The BAY RIDGE was temporarily repaired in Talcahuano, Chile, after which it resumed its journey to Valdez.
 
 
 8
 The charterer's second amended complaint contains five counts. The first four counts allege strict liability in tort, based on the alleged defects in the turbines manufactured by Delaval for the STUYVESANT, the WILLIAMSBURGH, the BROOKLYN, and the BAY RIDGE, respectively. The fifth count alleges negligence in the installation of the astern guardian valve of the BAY RIDGE. The second amended complaint invokes jurisdiction on the basis of Fed.R.Civ.P. 9(h) (admiralty), and the district court treated all of the counts of the complaint as being governed by federal maritime law. Delaval moved for summary judgment, arguing that the charterers' claims were solely for economic loss, and that such loss was not recoverable in tort.
 
 
 9
 In an opinion filed on October 5, 1982, the district court adopted the majority common-law position that losses caused by qualitative product defects are not recoverable in tort absent unreasonable risk of harm to persons or property other than the product. See Pennsylvania Glass Sand v. Caterpillar Tractor Co., 652 F.2d 1165 (3d Cir.1981). The court granted summary judgment on counts one through four on the basis that the strict liability allegations failed to state a cause of action in admiralty with respect to any of the vessels. The district court denied summary judgment on the negligence claim at that time, but in an opinion and order filed on January 24, 1983, reversed itself and granted Delaval's motion for summary judgment in its entirety. We affirm.
 
 II.
 
 10
 The first issue we must decide is whether the charterers' claims are within the maritime jurisdiction of the federal courts. 28 U.S.C. Sec. 1333(1) (1982). The district court found that all five counts were within maritime jurisdiction because the "nature of the vessels as mammouth oil tankers engaged in international commercial trade places them and the functioning vel non of their turbines close to the heart of federal admiralty concerns." (A-259). We agree.
 
 
 11
 In Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), the Supreme Court set forth a flexible two-part test for determining whether a claim is maritime in character and hence within the admiralty jurisdiction of the federal courts. First, there must be a "maritime locale" to the event that led to the litigation, and second, there must be a relationship between the wrong and traditional maritime activity. Addressing the second test first, we believe it undisputable that a close nexus exists between a malfunctioning turbine in a sea-going supertanker and the traditional maritime activity of shipping. The alleged wrong in this case involves commercial facets of maritime activity, and also implicates the traditional maritime concern of safe shipping. See, e.g., Sperry Rand Corp. v. Radio of America, 618 F.2d 319 (5th Cir.1980).
 
 
 12
 We also find that that a "maritime locale" is involved in all five counts of the charterers' second amended complaint. The parties agree that the events that form the basis for the first and fifth counts occurred at sea. The damage to the STUYVESANT's high pressure turbine (first count) and the BAY RIDGE's low pressure turbine (fifth count) occurred while the turbines were in use and while the ships were at sea, and was discovered while the ships were at sea. Similarly, although the damage to the BROOKLYN (second count) and WILLIAMSBURGH (third count) turbines was not discovered until the ships were in port, the damage in fact occurred at sea while the turbines were in use, and thus a maritime locale exists.[1] Finally, although the question is close, we find that a maritime locale also exists for the claim arising from damage to the BAY RIDGE's high pressure turbine (fourth count), even though the BAY RIDGE itself was never put to sea.
 
 
 13
 The charterers of all four supertankers allege the same basic claim: an alleged defect existed in each high pressure turbine's first stage steam reversing ring, which caused the ring to deteriorate and disintegrate in operation, with resulting damage to other component parts of the turbines. (App. at 26-31). This defect manifested itself over a period of time during the turbines' operation. After the STUYVESANT experienced initial problems with its turbine while at sea, an inspection was made, and the defective and damaged parts were removed, including the first stage steam reversing ring. Instead of ordering new parts from Delaval, arrangements were made to transfer certain component parts from the BAY RIDGE turbine, which was then in construction, to the STUYVESANT. (App. at 198-99). These allegedly defective component parts, from which flow the basis of the BAY RIDGE claim for damages, were then installed in the STUYVESANT. The STUYVESANT went back to sea, and again experienced problems with its turbine. Upon docking and inspection, it was discovered that the first stage steam reversing ring, the ring originally installed in the BAY RIDGE, had deteriorated and was thus damaged. (App. at 199). Thus, as with the other three supertankers, the defect in the central component part of the BAY RIDGE turbine manifested itself while the part was in operation on the sea. Although the ship itself never left port, the allegedly defective part did, and the basic damage for which recovery flows occurred in operation and on the sea. Accordingly, a maritime locale exists for all counts of the charterers' second amended complaint, including the fourth, and admiralty jurisdiction properly exists in the federal courts.
 
 III.
 
 14
 Because this case properly falls within the maritime jurisdiction of the federal courts, the appropriate law to apply is the federal common law of admiralty. This court has recognized that concepts of products liability, including Restatement (Second) of Torts Sec. 402A (1965), are applicable in admiralty law. See Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp., 726 F.2d 121, 123 (3d Cir.1984). In defining the contours of products liability doctrine in admiralty law, courts have consistently looked to the law of the land, and have relied on many of the same policy concerns that underlie the land-based products liability decisions. See, e.g., Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co., 565 F.2d 1129, 1134 (9th Cir.1977); Lindsay v. McDonnell-Douglas Aircraft Corp., 460 F.2d 631, 635 (8th Cir.1972); Schaeffer v. Michigan-Ohio Navigation Co., 416 F.2d 217, 221 (6th Cir.1969).
 
 
 15
 The charterers argue that there is no need to look to the law of the land, and invoke venerable precepts and cases that are said to demonstrate admiralty's hospitability to total compensation for casualty inflicted by the fault of another, including total loss of the use of a vessel. They cite, inter alia, to the principle of "restitutio in integrum," see Natalie Tankships Corp. v. Panama Canal Commission, 506 F.Supp. 281, 285 (D.Canal Zone 1980), and to Justice Story's opinion in The Apollon, 22 U.S. (9 Wheat.) 362, 6 L.Ed. 111 (1824), and argue that admiralty has traditionally allowed recovery in tort for losses incurred when a ship is rendered inoperable by the act of another. Although the charterers' argument is based on cases involving traditional maritime torts, such as collisions and unlawful detention, it is submitted that these cases are indistinguishable in principle from this case.
 
 
 16
 It is true that recovery for the value of the use of a ship for the time it is put out of use by tortious conduct is traditionally an element of damages in a tort suit. This element of damages is known as "demurrage." See, e.g., The Conqueror, 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937 (1897); Williamson v. Barrett, 54 U.S. (13 How.) 101, 110-12, 14 L.Ed. 68 (1851) (collision case); The Apollon, 22 U.S. (9 Wheat.) 362, 376, 6 L.Ed. 111 (1824) (detainer case); Skou v. United States, 478 F.2d 343, 345 (5th Cir.1973) (detainer case); The Hygrade No. 24 v. The Dynamic, 233 F.2d 444, 445-6 (2d Cir.1956) (collision case). In these cases, the traditional tort policy of full compensation is enforced in admiralty, as it is on land.
 
 
 17
 The question we address, however, is not what losses can be recovered once an act has been characterized as a tort, but whether under the modern law of products liability, as it has been imported into the law of admiralty, a products liability complaint that seeks recovery for damage to a product caused by a design defect states a cause of action in tort. We believe that the better view, and one in accord with the prevailing view on land, is that damage to a defective product is not actionable in tort unless the design defect creates an unreasonable risk of harm to persons or property other than the product itself. See, e.g., Seely v. White Motor Corp., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). But see Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965) (loss for qualitative product defects without risk of harm may be recoverable in a tort action).
 
 
 18
 The requirement of unreasonable risk of harm is consistent with the policies behind tort law. As Judge Adams noted in Pennsylvania Glass Sand v. Caterpillar Tractor Co., 652 F.2d 1165, 1169-70 (3d Cir.1982) ("PGS"):
 
 
 19
 Tort law rests on obligations imposed by law, rather than by bargain, and the thrust of Sec. 402A is that as a matter of public policy a duty should be imposed on manufacturers to "warrant" the safety of their products. The gist of a products liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or his property. On the other hand, contract law, which protects expectation interests, provides the appropriate set of rules when an individual wishes a product to perform a certain task in a certain way, or expects or desires a product of a particular quality so that it is fit for ordinary use.
 
 
 20
 In PGS, for example, the plaintiff sought recovery for damages incurred as a result of a fire in a front-end loader manufactured by the defendant. The loader did not come equipped with a system to suppress or extinguish fires, a defect which manifested itself one day when a fire suddenly broke out near the loader's hydraulic lines. Because the operator hastily evacuated the machine without turning off the motor, the fire quickly spread, fueled by hydraulic fluid. As a result of the fire, the plaintiff incurred expenses in repairing the machine and securing a replacement.
 
 
 21
 In determining whether tort law should provide a remedy for the plaintiff's losses, the court in PGS considered the nature of the defect, the manner in which the defect manifested itself, and the nature of the risk which was inherent in the defect. The court held that because the design defect was safety-related, because the defect could and did manifest itself in a sudden and calamitous manner, and because the safety hazard posed a serious risk to persons and property, the plaintiff stated a cause action in tort for the damages it suffered.
 
 
 22
 In our view, the test enunciated by Judge Adams in the PGS decision correctly balances the competing policies present in maritime law as well as in the law of the land. The charterers have not offered, and we do not discern, any persuasive difference between an action which seeks recovery for a defective ship engine and an action which seeks recovery for a defective car engine. In both cases, the law seeks to leave the parties to their bargain, while at the same time protecting consumers of both ships and cars from hazardous defects in the engines. Cf. Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp., 726 F.2d 121 (3d Cir.1984) (applying land-based products liability decisions to suit alleging defect in ship's crane).[2]IV.
 
 
 23
 Applying the test of PGS to the instant case, therefore, requires us to examine the circumstances of the charterers' claims, including the nature of the alleged defect, the manner in which the injury to the defective product occurred, and the type of risk that is inherent in the defect. The nature of the defect in this case appears qualitative, as opposed to safety-related. The charterers contend that certain component parts of the Delaval turbine were defective, and that they caused the turbine to malfunction. The defect involved internal deterioration and breakdown of the turbine's parts, and thus directly implicates the intended performance level of the turbine and the charterers' disappointed expectations in their purchase. Unlike the defect in those cases in which tort recovery is allowed for a damaged product, the defect in this case is not intimately related to the safety of the product, nor is it associated with calamitous events like fire or sudden collision. See, e.g., PGS, 652 F.2d at 1174 (front loader defective because of lack of fire suppression system); Cloud v. Kit Mfg. Co., 563 P.2d 248 (Alaska 1977) (mobile home defective because of highly-flammable carpet padding).
 
 
 24
 We also find that the manner in which the damage to the turbine occurred implicates the expectation-bargain policy of warranty law rather than the safety-insurance policy of tort law. PGS, 652 F.2d at 1173. In all the ships, the damage to the turbines occurred during normal operation of the turbine, and resulted from the gradual and unnoticed deterioration of the turbines' component parts. Indeed, it was not until the STUYVESANT experienced steam leakage and decreased power because of the disintegration of the first stage steam reversing ring that the charterers' discovered the defects in all the ships and the damage it caused. Unlike PGS, there was no "sudden or calamitous" event which triggered the manifestation of the defect and the resulting damage. See, e.g., PGS, 652 F.2d at 1174 (sudden fire, combined with lack of fire suppression system, caused total loss of front loader); Cloud v. Kit Mfg. Co., 563 P.2d 248 (Alaska 1977) (fire, combined with highly-flammable padding, severely burned mobile home); Cornell Drilling Co. v. Ford Motor Co., 241 Pa.Super. 129, 359 A.2d 822 (1976) (sudden fire in unoccupied, sitting truck damaged cab).
 
 
 25
 Finally, we must consider the type of risk, if any, that is inherent in this type of qualitative defect. Because the defect involved gradual deterioration of the turbine's inner mechanisms, the defect did not pose a risk of sudden or calamitous injury to persons or property. Instead, the risk created by the defect was that the turbine would operate at a lower capacity, thus reducing the ship's speed and causing the charterers' losses in the form of down-time for repair and lost profits. We believe that this type of risk, rather than implicating a manufacturer's obligation to place safe products in the stream of commerce, only concerns the charterer's expectations as to the commercial suitability of the product.
 
 
 26
 Consideration of the three PGS factors, therefore, leads us to the conclusion that the defective turbine did not pose an unreasonable risk of harm to persons or property, and thus that the charterers have failed to state a cause of action in tort. The charterers contend, however, that the defective turbine placed the STUYVESANT and its crew in peril during a storm off the Gulf of Alaska, and thus that tort recovery is appropriate. Even assuming that such allegations of imminent danger are credible,[3] we nonetheless find that because no persons or property were injured or damaged, no tort recovery is appropriate in this case given the qualitative nature of the defect and the gradual manner in which the defect manifested itself.
 
 
 27
 We find, therefore, that the district court, applying the rationale of PGS, properly granted summary judgment in favor of Delaval on all five counts of the second amended complaint. The judgment of the district court will be affirmed.
 
 GARTH, Circuit Judge, concurring:
 
 28
 I would affirm the district court's grant of summary judgment in favor of Delaval, but I would do so on grounds somewhat different from those on which the majority relies.
 
 
 29
 I believe the governing issue in this appeal is whether a mere qualitative product defect, which presents no unreasonable danger and which occasions no actual harm to persons or property beyond damage to the defective product itself, suffices to state a section 402A claim in strict liability in tort. In my opinion, no such strict liability claim has ever been stated by the charterers. Thus, although I would agree with the majority's analysis were a section 402A claim actually before us, the initial failure of the charterers even to allege the necessary elements of a products liability claim must itself preclude analysis of Delaval's purely hypothetical tort liability. My difference with the majority, though slight, is therefore significant.
 
 
 30
 Additionally, I cannot agree that the BAY RIDGE Count (Count 4) comes within admiralty jurisdiction. Instead, Count 4 must be dismissed, but its dismissal must result from the application of the principle established in Tully v. Mott Supermarkets, Inc., 540 F.2d 187 (3d Cir.1976).
 
 I.
 
 31
 In land-based products cases, a manufacturer's tort liability is premised upon a duty to sell products that are not "in a defective condition unreasonably dangerous" to a user's person or property. Restatement (Second) of Torts Sec. 402A (1977).[1] A manufacturer who violates this duty is subject to liability for any harm caused. The scope of section 402A, however, is not so broad as to allow the mere allegation of a qualitative defect to state a cognizable tort claim in the absence of allegations or proof of unreasonable danger and demonstrable injury.
 
 
 32
 This court has previously held that section 402A applies to cases within the admiralty jurisdiction where all elements of a section 402A cause of action have been met. See Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp., 726 F.2d 121, 123 (3d Cir.1984). Yet, to import recognized concepts of products liability law into federal maritime law is not to abandon the well-established threshold requirements for strict tort liability. An examination of the charterer's original and amended Complaints reveals that they allege no more than that the involved turbines were defective. One can search in vain for any allegation of unreasonable danger or actual injury--hallmarks of a section 402A claim. Count 1, pertaining to the STUYVESANT, alleges merely that Delaval negligently designed and manufactured the ship's turbine so that it was not reasonably fit for its intended purposes. Counts 2 through 4 repeat these allegations for each vessel.
 
 
 33
 Looking only to the Complaint, it is clear that no 402A claim was ever stated. Contrary to the majority's reading of the Complaint which recites that "the first four counts allege strict liability in tort, based on the alleged defects in the turbines ..." (Maj. Op. at 906), there is not the slightest hint or reference in any of the Complaint's four counts to "Section 402A," "strict liability," "unreasonable danger," or "injury." Instead, the Complaint as drawn and amended, whether construed as one in contract or in negligence, addresses issues generally characteristic of contract actions for breach of warranty.[2]
 
 
 34
 If we were testing this action by the standards attributable to a breach of warranty or contract complaint, I would find little fault with the cause of action that is stated. However, a contract or breach of warranty cause of action should not masquerade in section 402A trappings, particularly in an admiralty context. Indeed, in these proceedings, the disguise is transparent and has been unmasked in the summary judgment proceedings which followed the Complaint. Nowhere in any count of the Complaint have the charterers alleged that Delaval's products--the turbines--were unreasonably dangerous or caused injury, both of which are elements essential to the statement of a 402A claim.
 
 
 35
 Nor do the affidavits submitted in opposition to Delaval's motion for summary judgment establish any such injury or danger. Indeed, the sole evidence offered by the charterers to supply their missing allegations of unreasonable danger is an unsworn letter from the STUYVESANT's master who states that the malfunctioning turbine endangered the STUYVESANT during a storm encountered off the Alaskan coast. Although the underpowered vessel drifted toward the lee shore of the Gulf of Alaska, the ship successfully navigated the storm and sustained no injury. Thus, whether measured by the Complaint alone or by the Complaint and motion proceedings, no 402A claim has ever been established.
 
 
 36
 No matter how liberally we may construe section 402A, the qualitative defects manifested by the turbine's gradual internal deterioration cannot be made to substitute for the actual injury or unreasonable danger required as a predicate to strict tort liability. At oral argument, counsel for the charterers suggested that the simple presence of a defect should trigger tort liability. This approach would effectively require a manufacturer to become the general insurer of its products' performance throughout their reasonably productive lives, regardless of the dangers posed by such products. If, however, the mere existence of a defect were sufficient to impose strict liability, the threshold for a strict liability products action would be crossed whenever a product failed to satisfy a user's expectations.
 
 
 37
 As I have previously observed, the charterers have attempted to translate their predominantly contract based warranty claims into products liability claims. They should, however, be remitted to whatever contract remedies, if any, remain to them under the applicable agreements. Thus, although the majority opinion has chosen to meet the issue of section 402A liability directly, I suggest the issue itself is nonexistent.[3] My reading of the record reveals that there never has been, nor is there now, a viable 402A claim upon which we could rule. I would therefore affirm the district court's grant of summary judgment with respect to Counts 1, 2, 3, and 5 because no cognizable strict liability tort claims ever existed.
 
 II.
 
 38
 I must further disagree with the majority's conclusions that admiralty jurisdiction exists over Count 4 of the amended Complaint. That Count alleges defective design and manufacture of the BAY RIDGE'S turbines. The defects at issue, however, were discovered and repaired while the BAY RIDGE was under construction and before the BAY RIDGE put to sea. The sole connection of the allegedly defective BAY RIDGE turbine with a maritime locale arises because parts from the BAY RIDGE's engine were used to replace parts in the STUYVESANT's turbine. When the BAY RIDGE itself was finally complete, it was equipped with a redesigned turbine.
 
 
 39
 Accordingly, although the claim advanced by Count 4 may evince sufficient connection with traditional maritime activity to satisfy the second requirement (traditional maritime activity) of the jurisdictional test enunciated in Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), it fails to satisfy the first requirement of a "maritime locale."[4]
 
 
 40
 The majority opinion attempts to avoid the jurisdictional limits imposed by Executive Jet by reasoning that the use of the BAY RIDGE'S steam reversing rings in the STUYVESANT and the subsequent malfunction of those parts at sea supplies an adequate maritime locale for all Counts. The majority's reasoning, while ingenious, is wrong. The part cannot be said to yield jurisdiction over the whole. Sending a turbine to sea, let alone only a portion of a turbine, is not sending a ship to sea.
 
 
 41
 Presumably, under the majority's logic, if an engine manufactured in Detroit were shipped through the St. Lawrence Seaway and down the Atlantic Coast to the Brooklyn Navy Yard where it was installed in a vessel under construction, admiralty jurisdiction would exist over all subsequent complaints about the engine, whether or not the vessel ever put to sea. I do not believe this is an allowable jurisdictional principle within the meaning of Executive Jet.
 
 
 42
 Moreover, even if the majority opinion were correct in attaching admiralty jurisdiction to a steam reversing ring taken from the BAY RIDGE and then installed in the STUYVESANT, logic dictates that any resultant admiralty jurisdiction would derive from the STUYVESANT's activity and locale and not the BAY RIDGE's. Thus, all that the majority may have established is that the STUYVESANT came within admiralty jurisdiction, a matter which was never in dispute and which was demonstrated by the events related under Count 1. Hence, the attempt to find admiralty jurisdiction over Count 4 is futile, since Count 4 concerns only the BAY RIDGE which was still in dry dock. I therefore disagree with the analysis leading to the majority's holding that admiralty jurisdiction exists over Count 4.
 
 III.
 
 43
 Because the grant of summary judgment on all other Counts leaves no remaining federal questions to which Count 4 may be appended, the BAY RIDGE claim must be dismissed for lack of federal jurisdiction. See Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir.1976) (where no substantial federal claim to which the state claim could be appended remains, the primary justification for the exercise of pendent jurisdiction is absent).
 
 
 44
 I, too, would thus affirm the result reached below, although for reasons other than those articulated by the district court, see PAAC v. Rizzo, 502 F.2d 306 (3d Cir.1974), and expressed in the majority opinion.
 
 
 45
 BECKER, Circuit Judge, concurring and dissenting:
 
 
 46
 I share the majority's view that the Pennsylvania Glass Sand v. Caterpillar Tractor Co., 652 F.2d 1165 (3d Cir.1982) ("PGS "), standard should be adopted in strict products liability actions in admiralty where an injured party has made a claim for economic loss. This standard provides that products liability principles apply when a hazardous product exposes a plaintiff to "an unreasonable risk of injury to [plaintiff's] person or [plaintiff's] property." Id. at 1169. Accordingly, I join in Parts I and III of the majority opinion and in the consequent affirmance of the grant of summary judgment for Delaval on counts II, III, and V of the Charterer's second amended complaint because these counts do not implicate an unreasonable risk of harm to person or property. In my view, however, the exposure of the disabled STUYVESANT to a storm of "mountainous seas" created an unreasonable risk of harm and otherwise met the PGS standard. Therefore, I cannot join in Part IV of the majority opinion in which the majority applies PGS to count I of the complaint so as to affirm the grant of summary judgment. I would vacate the grant of summary judgment for Delaval on count I and remand for further proceedings.
 
 
 47
 I also join in Part II of Judge Garth's concurring opinion. Even though shipbuilding is a traditional maritime activity, maritime jurisdiction does not exist without some nexus to a maritime locality. I believe, with Judge Garth, that the majority is simply wrong in concluding that a maritime locality exists when economic loss due to a product defect is claimed for a vessel that has never been commissioned, because the vessel has been "cannibalized" and one of its parts has been put to sea on another ship and then returned to the aggrieved vessel. Judge Garth has explained in a forceful manner why we have no maritime jurisdiction over count IV, and I will not address the point further.[1] I will therefore limit the remainder of this separate opinion to a discussion of the STUYVESANT claim (count I).
 
 
 48
 I fully agree with the majority's conclusion that, in the maritime context, tort principles may apply when a defect causes only damage to the defective product itself, with no attendant injury to persons or other property.[2] The majority has done so by embracing a test, cogently articulated by Judge Adams in PGS, that is intended to identify when a defect that has injured only the defective product itself has caused "an unreasonable risk of harm" and has thereby implicated products liability principles.[3] In view of the foregoing, I would have joined in the majority opinion except that I disagree with its application of the PGS test.
 
 
 49
 In PGS the court focused upon three factors in an effort to identify "whether the safety-insurance policy of tort law or the expectation-bargain policy of warranty law is most applicable to [the] particular claim." PGS, 652 F.2d at 1173. These "interrelated" factors, specifically adopted by the majority, are the nature of the defect, the type of risk, and the manner in which the injury arose. Id. The majority applies these factors to the allegations in this case and concludes that the policy of tort law is not implicated because the defect was qualitative in nature and because the defect manifested itself in a gradual manner.
 
 
 50
 In considering the nature of the defect, the majority's underlying analysis is intended to identify whether the defect at issue in the case can be seen as having a nexus to product safety sufficient to implicate strict liability principles.[4] Although this focus is consistent with both Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), and PGS,[5] the majority's conclusion that the defect in the turbine was not "safety-related" is, in my view, unwarranted. The majority's error in this regard is evident if one compares the nature of the defect in this case with the nature of the defect in PGS. The application of tort principles was appropriate in PGS because the lack of sprinklers and fire-safety instructions for a front-loader poses a serious risk to persons, property, and the product itself in the event of a fire. Similarly, based on the allegations in this case, the application of tort principles is appropriate because the defect in the STUYVESANT's turbine that rendered it useless in powering the ship posed a serious risk to persons, property, and the product itself in the event the power failure occurred when there was some unrelated danger at sea that required a vessel with full power. In both cases, therefore, the defects substantially increased the risk of serious physical injury or property damage and thereby implicated the concerns of public safety that underly tort law.[6]
 
 
 51
 My analysis should not be read as suggesting that all defects are safety-related once they become manifest. For example, it is useful to contrast the defects at issue in this case and PGS with a defect in a turbine used to power an automated assembly plant. If the consequence of this hypothetical defect were that the assembly-line machinery simply stopped performing, product liability principles would not be implicated. Cf. Posttape Associates v. Eastman Kodak Co., 537 F.2d 751, 755 (3d Cir.1976) ("The flaw in the film in no way made it a threat to person or tangible property. The product did not perform as expected, but by no stretch of the imagination could it be considered 'unreasonably dangerous.' "). I believe that it is a hypothetical defect of this type that the first PGS factor (the nature of the defect) indicates does not implicate tort principles. We are not, however, considering defective assembly-line machinery or flawed film. In this case, considerations of public safety are clearly implicated because a design defect has allegedly caused the breakdown of a product that powers a ship and has thereby caused imminent peril and near catastrophe. In sum, the majority fails to consider the "nature of the defect" in a manner consistent with the PGS framework.
 
 
 52
 The majority's second reason for deciding that there is no unreasonable risk of harm in this case is "the gradual manner in which the defect manifested itself." Once again, I am in agreement with the focus of the majority's analysis: A court must examine the context in which a claim arises to ensure that the policy concerns of tort law are, in fact, implicated, that is unless tort recovery is to be permitted any time a claim is made for damages to a product that result from a safety-related defect. The necessity of this limitation on tort recovery may be illustrated by reference to the facts in PGS, a case in which the majority concludes the defect was "intimately related to the safety of the product." Maj. op. at 910. Notwithstanding this close nexus to product safety, if the defect had been detected during a fire safety inspection so that repairs could have been made prior to any calamitous injury by fire, an inquiry into the "manner in which the defect manifested itself" would indicate that recovery under tort principles was not appropriate. Recovery in PGS was warranted not only because the design defect became manifest in circumstances that were sudden, but also, and more importantly, because the circumstances posed a significant threat of injury to person and property. See PGS, 652 F.2d at 1174 ("Here, the damage to the front-end loader was the result of a fire--a sudden and highly dangerous occurrence."). The latter fact is the critical fact--the "suddenness" would seem secondary. Although in PGS the defect was the absence of a sprinkler system, in the typical case of a mechanical breakdown caused by a defect, there will be deterioration over time culminating in the manifestation of the defect.
 
 
 53
 I believe that circumstances highly analogous to those existing in PGS are at least alleged in this case. Although I would agree that the defect in the turbine might be characterized as one that caused "internal deterioration" as it powered the STUYVESANT, the defect nevertheless caused a complete breakdown that allegedly enhanced a preexisting, unrelated danger, namely a violent storm at sea. Thus, the turbine's defect became manifest in a "sudden and highly dangerous" context, thereby suggesting that tort principles ought to apply. Whether the deterioration in the turbine could have been detected earlier by close inspection is an issue as irrelevant to a correct decision in this case as the consideration of whether fire safety inspectors could previously have assessed the front-loader's defect would have been to the decision in PGS.
 
 
 54
 Stated briefly, I believe that the test outlined in PGS and adopted by the majority has to be clearly focused on two issues if it is to be effective in identifying cases that implicate the policies of tort law. First, a court must consider whether the defective product could result in an unreasonable risk of harm to person or property. Second, the court must decide whether the circumstances in which the defect became manifest were such that the defect actually resulted in the unreasonable risk. This second inquiry ensures that tort recovery is not available every time a defect that can generally be described as safety-related becomes manifest. Under my approach, a line is drawn between cases in which the damage to the defective product occurs in circumstances that do not create risk and cases in which the damage occurs in circumstances that do create risk. The importance of these two considerations is, in fact, suggested by the court's statement in PGS that "the nature of the defect and the type of risk it poses are the guiding factors" in the analysis. 652 F.2d at 1174.
 
 
 55
 Notwithstanding the foregoing analysis, I readily concede that this is a very close case and that the proposition that East River should be permitted to pursue tort recovery as to count I is not free from doubt. Although the majority would deny tort recovery based on the PGS test, I believe that a stronger argument against recovery is that PGS was simply not intended to apply to cases in which the damage to the defective product itself was not causally related to the violent collision or calamitous event during which the defect in the product became manifest. PGS did not have to reach this issue because additional damage to the front-loader was caused by the fire as a result of the absence of a sprinkler system.[7] In this case, however, no additional damage to the turbine resulted from the storm at sea as a result of the defect: the damage to the turbine apparently would have occurred to precisely the same extent regardless of the storm at sea. A requirement that the external hazard result in actual damage to the defective product would no doubt be a principled limit on the availability of tort recovery when there is damage only to the defective product. I would reject such a limitation, however, because to read PGS as establishing a bar against recovery in such "near miss" cases would disserve the principles of tort law that motivated the decision.[8]
 
 
 56
 In sum, the majority's decision about the general applicability of tort law principles in admiralty is correct. The majority errs, however, in its application of the PGS factors to the allegations in this case. In my view, the charterers' evidence concerning the STUYVESANT incident raises a genuine issue of material fact concerning the risk to the STUYVESANT as a result of the defective turbine. I believe that the affidavits at least present a triable issue as to whether the increased risk to the STUYVESANT which resulted from the defective turbine was significant enough to be characterized as "unreasonable," and whether harm was imminent. I would therefore remand for a judicial determination as to whether the loss of speed attributable to the turbine's breakdown significantly increased the risk created by the stormy seas of the Gulf of Alaska. If it did not, the plaintiffs as a matter of law cannot recover their economic loss in tort.[9] If, however, the plaintiffs can succeed in proving that the turbine's breakdown did cause an unreasonable risk, they are, under my view of the case, entitled to damages for economic loss, given the fact that the PGS test is otherwise met.
 
 
 57
 Circuit Judge A. LEON HIGGINBOTHAM, Jr., joins in this opinion.
 
 
 
 *
 Honorable Clarence C. Newcomer, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 We also note that a ship in port is considered to be in a "maritime locale." See, e.g., Southern Steamship Co. v. NLRB, 316 U.S. 31, 41, 62 S.Ct. 886, 892, 86 L.Ed. 1246 (1942)
 
 
 [2]
 Our reasoning in this case is equally applicable to products liability cases brought in negligence and those brought in strict liability, and thus is applicable to all five counts of the second amended complaint. One of the cases we rely on in the text, Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), involved negligence as well as strict liability claims, and the court in that case did not distinguish between the two theories in applying the rule against recovery of damages where an unreasonable risk of harm is not present. See also Flintkote Co. v. Dravo Corp., 678 F.2d 942, 950 (11th Cir.1982) (applying Georgia law); Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 626 F.2d 280, 285-88 (3d Cir.1980) (applying Illinois law)
 
 
 [3]
 In an unsworn letter, the STUYVESANT's master noted that because of the turbine's malfunction, the STUYVESANT could not reach top speed, and thus had difficulty making headway into a storm off the Gulf of Alaska. (App. at 206). The difficulty caused the master to fear that the ship would drift hazardously close to the lee shore of the Gulf. The ship, however, did successfully travel against the storm, and in fact proceeded to Panama, a voyage of some seven weeks. Indeed, after unloading its cargo at Panama, the ship proceeded to San Francisco, where the turbine was examined for problems. As the district court stated, "any nascent allegations of acute peril to the ship or crew resulting from the turbine defect are belied by the course of action undertaken after the defect manifested itself." (App. at 264)
 
 
 [1]
 Section 402A of the Restatement (Second) of Torts provides:
 Special Liability of Sellers of Products for Physical Harm to User or Consumer.
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property, is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if,
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 
 
 [2]
 The record discloses that no actions may now be maintainable under the warranties given by Delaval
 
 
 [3]
 When asked at oral argument how the 402A issue arose, neither counsel was able to answer the question satisfactorily. Indeed, that counsel should center their arguments around whether under admiralty law economic loss may be recovered in a products liability action, without first addressing whether the factual predicate to liability ever existed, is incomprehensible. Both counsel, in their briefs and argument, focused solely upon the availability of economic loss in an admiralty 402A case. As I understand the concept of economic loss that was advanced, it would consist of essentially consequential damages resulting from the defective turbines--a measure of damages more traditionally associated with warranty or contract claims
 I applaud the majority's decision not to address the economic loss argument, as that argument was never properly part of this case. Any discussion of the kinds of damages available in a bona fide 402A claim brought in admiralty can here be only speculative. Jurisprudence counsels that the issue of damages, and particularly the question whether economic loss can ever be recovered in a legitimate admiralty 402A action, should await decision in a case where the pleadings clearly state a 402A claim. Only after an initial finding of strict liability should a court address the kind and amount of damages which a plaintiff may recover.
 
 
 [4]
 The majority opinion (at 901, n. 1) relies upon Southern Steamship Co. v. NLRB, 316 U.S. 31, 41, 62 S.Ct. 886, 891, 86 L.Ed. 1246 (1942) for the proposition that a ship in port is in maritime locale. Southern Steamship dealt with a strike on board a ship away from her home port and lying at anchor in another domestic port. The Court held that for purposes of determining whether the strike was mutiny within the meaning of 18 U.S.C. Secs. 483, 484, a port could be deemed a maritime locale. The Court's decision did no more than reaffirm the traditional rule that for a vessel in service, a port or harbor was within the maritime jurisdiction. Id
 In the present case, no one disputes that discovery of the damage to the BROOKLYN and the WILLIAMSBURGH, while these ships were in port, yields a maritime locale. Those ships, however, had put to sea and had sustained damage at sea.
 Neither Southern Steamship nor Executive Jet can be read to overcome the well-established maritime rule that contracts to construct ships are nonmaritime in nature and hence not within the admiralty jurisdiction. See, e.g., Kossick v. United Fruit Company, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); Ohio Barge Lines, Inc. v. Dravo Corp., 326 F.Supp. 863 (E.D.Pa.1971). The BAY RIDGE, while under construction, cannot be deemed to have a maritime locale.
 
 
 [1]
 Because under my view of the case count I would survive summary judgment, there would be a valid federal claim to which count IV could be appended. Assuming, however, that count I does not survive summary judgment, Judge Garth appears to be correct when he states that Tully v. Mott Supermarkets, Inc., 540 F.2d 187 (3d Cir.1976) would require dismissal of count IV for want of federal subject matter jurisdiction. Tully would seem to require dismissal of count IV, a pendent claim arising from a common nucleus of operative fact, see Gibbs v. United Mine Workers, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), even though the now-dismissed federal claim to which count IV was originally appended is within the exclusive jurisdiction of the federal courts and, hence, could not have been brought in state court. The federal claim in Tully arose under Sec. 10(b) of Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), another area in which the federal courts exercise exclusive jurisdiction. See Securities Exchange Act of 1934, Sec. 27 (codified at 15 U.S.C. Sec. 78aa). Were I of the view that count I does not survive summary judgment, and a majority of the court were in agreement, I would think it appropriate for the in banc court to address specifically the correctness of the Tully result, at least in the admiralty context. See In re Oil Spill By Amoco Cadiz Off Coast of France, 699 F.2d 909, 913-14 (7th Cir.1983) (dictum) (suggesting that the "strong admiralty policy in favor of providing efficient procedures for resolving maritime disputes" counsels in favor of a liberal approach to joinder, notwithstanding decisions rejecting pendent jurisdiction in the diversity context); Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 811 (2d Cir.1971)
 
 
 [2]
 This conclusion, although implicit through much of the majority's opinion, is finally made explicit in the following statement of the holding: "we ... find that because no persons or property were injured or damaged, no tort recovery is appropriate in this case given the qualitative nature of the defect and the gradual manner in which the defect manifested itself." Maj. op. at 910 (emphasis added)
 
 
 [3]
 The majority has, appropriately, rejected the contrary rule which allows only contract remedies when the defective product alone is damaged by a defect. See, e.g., Mid-Continent Aircraft v. Curry County Spraying Service, 572 S.W.2d 308 (Tex.1978)
 
 
 [4]
 The terms, "qualitative" and "safety-related," used by the majority to describe the focus of this analysis are, I believe, misleading. I recognize that the majority's shorthand use of the terms is fully consistent with PGS. See, e.g., 652 F.2d at 1172. Nevertheless, it is apparent that all defects that cause damage are qualitative and defects that cause injury or imminent peril are also safety-related. Both the lack of precision in these terms and their at least partial overlap may account for the majority's uncritical decision to label as "qualitative" the defect in the ship's turbine
 
 
 [5]
 The conclusion in Seely and PGS that product liability law applies only if the defect is hazardous is in marked contrast to the analysis and rule established in Santor v. A & M Karagheusian, 44 N.J. 52, 207 A.2d 305 (1965). In Santor, the court did not focus its analysis on the proper interrelationship between contract and tort in the context of economic loss, but on the use of tort and warranty-based products liability theories in breaking down the "citadel of privity" in defective products cases. The court felt that these latter principles applied regardless of whether the defect was hazardous or qualitative. Santor 's analysis is based on the paradigm of a manufacturer whose goods are sold to individual consumers whose only information about the quality of a product is the reputation of the manufacturer. The opinion focused on two characteristics of this market place: the seller's greater knowledge and greater bargaining power. Under such circumstances, Santor concluded, simple justice requires that the manufacturer guarantee the quality of the product. I believe that this expansive approach to products liability in tort unnecessarily infringes freedom of contract. It is worth noting in this regard that two other courts of appeals have allowed recovery for economic loss when a defect has resulted in damage only to the defective product despite the fact that the three PGS factors would indicate that recovery in tort was not appropriate. See Miller Industries v. Caterpillar Tractor Co., 733 F.2d 813 (11th Cir.1984) (allowing recovery of economic loss due to delays and expense caused by a faulty engine to ship owners and others with an interest in the lost fishing catch, but limiting its holding to the facts of the case); Emerson G.M. Diesel, Inc. v. Alaskan Enterprise, 732 F.2d 1468, 1472-74 (9th Cir.1984) (declining to follow Seely and holding that a fishing vessel could recover repair costs and lost profits caused by a defective hose)
 This brief reference to Santor is also of relevance, because, under my theory, count IV states a pendent state law claim. The charterers argue that the claim should be governed by the law of New Jersey and that under New Jersey law, as embodied in Santor and its progeny, they are entitled to recover for their purely economic losses.
 
 
 [6]
 The majority, in fact, suggests in its opinion that a defect in a ship's engine or turbine would in some cases implicate tort principles. See maj. op. at 909 ("In [cases of defective ship and car engines], the law seeks to leave parties to their bargain, while at the same time protecting consumers of both ships and cars from hazardous defects in the engines."). The majority does not articulate in any detail why the manifestation of the defect alleged in this case was not "hazardous," given the fact that it left a ship without power during a severe storm at sea. The majority also does not provide any specific examples of engine defects that it would consider sufficiently hazardous to implicate strict liability principles
 
 
 [7]
 The cases that PGS relied on also evidenced this causal relationship between the damage to the defective product and the calamitous event. In Seely, supra, the damage to the truck was caused by the accident that resulted from the brake failure. In Cloud v. Kit Mfg. Co., 563 P.2d 248 (Alaska 1977), additional damage to the mobile home was caused by the fire because the carpet was made of flammable material
 
 
 [8]
 As the discussion in the text indicates, I believe that PGS should apply to a case involving a "near miss" or "imminent risk of harm." I believe that even if this result represents an extension of the Seely/PGS doctrine, it is a principled and proper extension as well as a minimal one. See PGS, 652 F.2d at 1169 ("The gist of a products liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or his property." (emphasis added))
 I also recognize that this is not a sympathetic case for allowing recovery because the parties are large corporations who were fully able to protect their respective interests at the time of the purchase of the turbine. I note in this regard that the status of the parties is simply not relevant to the PGS analysis adopted by the majority. Perhaps, however, the solution in this regard is that commercial purchasers should be able to waive tort liability for damage to property. Cf. U.C.C. Sec. 2-719(3) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable"). Judge Higginbotham believes that tort liability for economic loss can be waived by a commercial purchaser in an admiralty case.
 
 
 [9]
 The plaintiff bears the burden of showing that a defect creates an unreasonable risk of harm. In this regard the plaintiff must show that the risk of harm involved was a result of product defect--the standard causation question--and that it was unreasonable. This will require a plaintiff to carry the substantial burden of showing that there was an unreasonable risk in spite of the fact that no actual harm ensued. Although meeting this burden may be particularly difficult where, as here, the danger was created by an extrinsic source and the product defect allegedly enhanced the existing danger, the plaintiff, in my view, should have an opportunity to present the evidence to a fact-finder